2018 UT App 57

## THE UTAH COURT OF APPEALS

MICHAEL UZELAC AND HOLLY UZELAC,
Appellants,
*v.*
FIRE INSURANCE EXCHANGE,
Appellee.

Opinion
No. 20150699-CA
Filed April 5, 2018

Third District Court, Salt Lake Department
The Honorable Denise P. Lindberg
No. 110903573

L. Rich Humpherys and J.D. Lauritzen, Attorneys
for Appellants

Andrew M. Morse, Kenneth L. Reich, and Brian A.
Mills, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and KATE A. TOOMEY concurred.[1]

ORME, Judge:

¶1    Only days before Appellants Michael and Holly Uzelac
were scheduled to close on a permanent mortgage for their new,
custom-built vacation home, they learned that vandals had
broken into the home and caused extensive damage. The Uzelacs
submitted several claims to their insurer, Appellee Fire

---

1. After hearing the arguments in this case, Judge Stephen L.
Roth recused himself and did not participate in the consideration
of the case. Judge Michele M. Christiansen, having reviewed the
briefs and listened to a recording of the oral arguments,
substituted for Judge Roth and participated fully in this decision.

Insurance Exchange (FIE), and FIE made payments to cover most of the necessary repairs. Nevertheless, believing they were entitled to more, the Uzelacs filed suit against FIE to obtain additional compensation. The parties proceeded to litigate, and ultimately the district court entered summary judgment in favor of FIE. The Uzelacs now appeal. For the reasons discussed below, we affirm the district court's decision in part and reverse it in part, and we remand the case for further proceedings.

BACKGROUND[2]

¶2 In February 2008, having received word that the construction and interior decoration of their new vacation home had finally been concluded, the Uzelacs set out to view the completed home for the first time. The home, set in the mountains above Fruitland, was large and luxurious, with lavish, custom-designed furnishings. Upon arriving, they were horrified to find that their expensive new home was in shambles.

¶3 Vandals had forced their way into the home; torn apart the walls and ceiling; smashed exterior windows; and ripped the plumbing from the framework, flooding the structure with hot water. Combined with the frigid winter temperatures, the water continued to wreak havoc upon the home even after the vandals departed. Hardly a square foot of the home was left undamaged.

¶4 The Uzelacs immediately filed a homeowner's insurance claim with FIE, claiming extensive damage to the home and its contents. Soon after, an FIE representative visited the scene to inspect the home and inventory the damaged personal property.

---

2. "When reviewing a district court's grant or denial of a motion for summary judgment, we view the facts in a light most favorable to the party opposing the motion." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 31, 116 P.3d 323 (citation and internal quotation marks omitted).

FIE arranged for a third party, ServiceMaster, to conduct mitigation and remediation services, the bulk of which consisted of drying out the home and its contents and boxing up and storing the Uzelacs' furniture and belongings.[3] FIE never took the position that the Uzelacs' policy was not in effect when the vandalism occurred or that vandalism did not fall within the scope of the policy's coverage.

¶5     FIE received and processed numerous claims from the Uzelacs in connection with the vandalism. Nearly all of the claims were approved, some on the same day they were received. Indeed, altogether, FIE disbursed over $900,000 to cover repairs to the home and over $100,000 to cover damage to the Uzelacs' personal property. But FIE did reject some of the Uzelacs' claims.

¶6     In particular, the Uzelacs assert they made three requests that FIE wrongfully rejected.[4] The first request involved an

---

3. As a factual matter, FIE maintains that it was the Uzelacs who contracted with ServiceMaster to conduct mitigation and remediation services. The Uzelacs contend that, on the contrary, FIE contracted with ServiceMaster pursuant to its "preferred vendor" program. We recognize that this issue carried some legal significance below, but with respect to the claims now on appeal, it is largely immaterial. Nonetheless, as stated above, we view the facts in favor of the party against whom summary judgment was rendered—here, the Uzelacs. *See id.* ¶ 31.

4. FIE raises the point, which the Uzelacs do not contest, that the Uzelacs did not submit the first two of these three requests to FIE in the form of a formal, written claim. The Uzelacs respond that FIE should not be permitted to raise this as a defense because the only reason the Uzelacs never submitted a formal claim is that an FIE agent orally informed them that the policy would not cover their requests. We conclude that, because FIE has not pointed to anything in the policy clearly stating that an

(continued…)

attempt to recoup certain unanticipated financing expenses that arose as a consequence of the vandalism. Although the Uzelacs had found a lender willing to provide permanent mortgage financing for their new home before construction was completed, closing was contingent on the Uzelacs' first obtaining a certificate of occupancy for the home. As a result of the extensive vandalism, the Uzelacs were unable to obtain the certificate, and they therefore had no choice but to secure a "bridge loan" during the interim reconstruction period. In response to the Uzelacs' inquiry, FIE informed them that the additional expenses flowing from the bridge loan's higher interest rate were not recoverable under the policy.

¶7     The second request involved the question of whether and on what terms the Uzelacs' policy would cover the expense of substitute accommodations. In a declaration attached to the Uzelacs' opposition to FIE's motion for summary judgment, Mr. Uzelac averred that shortly after the vandalism occurred, he contacted FIE to inquire whether his policy would cover the expense of renting a substitute vacation home while theirs was being rebuilt. According to him, an FIE representative informed him that it would not. For its part, FIE has conceded that the policy would have covered the expense of renting a second home, but only if the Uzelacs had actually incurred that expense. In turn, Mr. Uzelac stated in his declaration that the only reason he and his wife did not rent a second home is that FIE led them to believe the expense would not be covered.

¶8     Finally, the third request involved the malfeasance of ServiceMaster. In November 2009, as the repairs to the home neared completion, ServiceMaster retrieved the Uzelacs' salvaged personal property from storage and delivered the items

---

(…continued)
insured's request will not be considered absent a formal, written claim, the Uzelacs' failure to submit a claim in such a manner is not dispositive, and we need not consider the point further.

back to the home. To the Uzelacs' dismay, many of the items were returned in a ruined condition. For example, mattresses were rotten and mildewed, and the pages of books and photograph albums were stuck together in brittle clumps. The property apparently had not been properly dried out before being placed in storage, and as a result much of it was beyond repair. The Uzelacs submitted a claim for this damage, but FIE denied it, explaining that the Uzelacs would need to pursue their claim against ServiceMaster directly.

¶9     Early in 2011, the Uzelacs filed suit against FIE and ServiceMaster, asserting breaches of contract and the implied covenant of good faith and fair dealing. In support, they alleged that FIE had "failed and refused . . . to pay [the Uzelacs] the moneys owing to them, despite demand therefor," and that FIE had "engaged . . . in a course of conduct to further its own economic interest . . . in violation of its obligations to [the Uzelacs]." Yet the complaint contained few specifics, and the Uzelacs' initial disclosures did not clarify matters much. In their disclosures, under the heading "Computation of Damages," the Uzelacs claimed they were seeking "[t]he amounts that would be owing under the policy as set forth in the complaint" in addition to "[g]eneral and consequential damages," "[e]xemplary and punitive damages," and costs and attorney fees. The Uzelacs' "computation" did not make direct reference to any itemized list of expenses or specific dollar figures.

¶10    Somewhat perplexed by the Uzelacs' reluctance to state their damages with specificity, FIE asked Mr. Uzelac at his deposition just what it was that he wanted FIE to cover that had not already been paid:

> Q.    Okay. Before we get into this I want to make sure I understand a couple of things. First, this list of damaged items [of personal property that you provided to us, which I have marked Exhibit 6], is this the extent of your damages in this case? I understand that there's on page 4 of Exhibit 1 also

> a list of some items . . . . So the list that you made in Exhibit 6 and the final page of Exhibit 1, is that the sum total of everything . . . that you think [FIE] ought to cover?
>
> A.     No.
>
> Q.     Okay. What else are we talking about?
>
> . . . .
>
> A.     . . . [T]he bridge loan that we had to get.

The two deposition exhibits to which FIE's counsel directed Mr. Uzelac's attention each contained a list of expenses that the Uzelacs had submitted to FIE for reimbursement. The first, Exhibit 6, identified certain items of personal property that had been damaged during the vandalism, and the second, Exhibit 1, itemized reconstruction services, including snow-removal services, the costs for which exceeded $50,000. Notably, during his deposition Mr. Uzelac did not indicate that he and his wife intended to pursue a claim relating to the costs of substitute vacation accommodations.

¶11     Shortly after the Uzelacs settled their claims against ServiceMaster, resulting in its dismissal from this action, FIE moved for summary judgment. In its supporting memorandum, FIE explained that Mr. Uzelac had "identified in his deposition only two issues as the basis for his litigation against FIE. First, [the Uzelacs] believed that FIE did not compensate [them] for certain personal property items that were damaged during the vandalism of their cabin." FIE explained that the items in question were the items listed in Exhibit 6 and other items that were allegedly mishandled by ServiceMaster. "Next, [the Uzelacs] believed FIE should have to pay for the interest on a 'bridge loan' [they] obtained." FIE then devoted the bulk of its motion to arguing that it was entitled to judgment as a matter of

law on these two issues, without mentioning the reconstruction expenses identified in Exhibit 1.

¶12    In their opposition, the Uzelacs began by defending the validity of the claims Mr. Uzelac raised in his deposition and then identified a number of additional factual issues they believed should preclude summary judgment. Chief among these was their claim that FIE made misrepresentations regarding the scope of their policy coverage, thereby leading them to believe, incorrectly, that the expense of renting a substitute vacation home would not be covered. In connection with that claim, the Uzelacs asserted—for the first time during the proceedings before the district court—that they would be seeking the reasonable value of the expenses they would have incurred in renting a comparable vacation home if they had been properly informed about the policy's coverage for this expense. In addition, the Uzelacs maintained that summary judgment was inappropriate because a factual issue remained as to whether FIE should be held vicariously liable for the property damage caused by ServiceMaster—to the extent, presumably, that these losses remained unpaid after the Uzelacs' settlement with ServiceMaster.

¶13    After hearing oral arguments on FIE's motion, the district court orally entered its ruling, granting the motion in part and denying it in part. With respect to the Uzelacs' claim for the damaged items of personal property, the court concluded that judgment should be rendered in FIE's favor because there was no genuine dispute that the Uzelacs had been adequately reimbursed for those expenses, albeit in a somewhat smaller amount than they had hoped for. The court further concluded that FIE was entitled to judgment as a matter of law on the Uzelacs' claims for the additional bridge loan expenses and the substitute accommodations expenses, as the former expense category was not recoverable under the terms of their policy and the latter was recoverable only if the expenses had actually been incurred. The court did, however, determine that a genuine issue of fact remained as to whether a principal–agent relationship

existed between FIE and ServiceMaster, such that FIE might be vicariously liable for certain losses attributable to ServiceMaster that remained unpaid after the Uzelacs' settlement with ServiceMaster. The court directed counsel for FIE to prepare a proposed order based on its oral ruling, which counsel filed on March 7, 2014.

¶14    The Uzelacs filed an objection to FIE's proposed summary judgment order on March 17, 2014,[5] arguing that it improperly purported to dispose of all the Uzelacs' direct claims against FIE when in fact one remained: their claim to recoup the expenses identified in Exhibit 1. The Uzelacs maintained that, by omitting any reference to the Exhibit 1 expenses in its initial motion, FIE had effectively excluded them from the scope of the summary judgment proceedings.[6] The court, however, was not persuaded.

---

5. As FIE correctly observes, the Uzelacs filed their objection three days after the deadline for doing so had passed. *See* Utah R. Civ. P. 7(j)(4) ("A party may object to the form of the proposed order by filing an objection within 7 days after the order is served."). Nevertheless, because the district court expressly agreed to consider the objection on its merits before entering its final order, the issues presented in the objection were properly preserved for appeal. *American Fork City v. Robinson*, 2012 UT App 357, ¶ 3, 293 P.3d 1105 ("To preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue.") (citation and internal quotation marks omitted).

6. In their briefing on appeal, the Uzelacs identified the expenses in Exhibit 1 that they contend should have been excluded from the scope of the district court's summary judgment order: "fabricate base and case—$1,267.25; molding material—$1,962.10; final cleaning after construction—$3,385.00; labor for paint and stain/remolding—$27,157.50; general labor—$2,822.00; specific labor re demolition/remolding—$14,557.50; and Sizzer

(continued…)

In a note to the parties delivered on the same day that it entered its final order, the court stated that it had "reviewed and considered [the Uzelacs'] objections to the proposed [o]rder" and "conclude[d] that FIE's [o]rder accurately reflect[ed its] ruling." Accordingly, the court adopted FIE's proposed order without change.

¶15    Thereafter, the Uzelacs and FIE settled the claims on which the court had specifically denied summary judgment, but the Uzelacs reserved their right to appeal the court's summary judgment decision. This appeal followed.

ISSUES AND STANDARDS OF REVIEW

¶16    The Uzelacs ascribe four errors to the district court's summary judgment decision. First, they maintain that the district court erred by concluding that the additional expenses

---

(…continued)

[sic] lift rental—$232.88." Strangely, though, while Exhibit 1 contains an expense for "snow removal," and while neither FIE's motion nor the court's order makes any specific reference to a snow-removal expense, the Uzelacs do not argue that this expense should be excluded from the summary judgment along with the other Exhibit 1 expenses. Perhaps this is because the Uzelacs concluded—erroneously, as we explain below, *see infra* note 12—that by making a passing reference to "snow-plowing" in their opposition memorandum, they inadvertently placed the snow-removal expense within the scope of the summary judgment proceedings. Rather, they address the expense in a separate, rather anomalous section of their opening brief, which is only a single paragraph in length. Because we ultimately conclude that the Uzelacs' claim to recover the snow-removal expense survived summary judgment for the same reasons that their other Exhibit 1 expense claims did, we address these claims together in part III.

they incurred as a consequence of the bridge loan were not recoverable under their policy. Second, they maintain that the court should have determined that there remained a triable issue of fact as to whether FIE should be liable to them for the fair rental value of their home during the period it was being reconstructed, as a reasonable measure of the value of the substitute vacation accommodations to which they were entitled under the policy. Third, they argue that the court should not have dismissed their claims relating to the expenses identified in Exhibit 1. And finally, the Uzelacs maintain that the court erred by dismissing their claim for breach of the implied covenant of good faith and fair dealing.

¶17 "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 6, 286 P.3d 301. "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 18, 258 P.3d 539. Finally, as previously noted, "when reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Ault v. Holden*, 2002 UT 33, ¶ 15, 44 P.3d 781 (citation and internal quotation marks omitted).

ANALYSIS

¶18 With the applicable standard of review in mind, we address each of the Uzelacs' assignments of error in turn.

I. The Bridge Loan Expenses

¶19 The Uzelacs contend that the district court erred in concluding that the additional expenses they incurred as a result of obtaining the bridge loan were not recoverable under the

terms of their policy. On this issue, we conclude that the Uzelacs have failed to carry their burden of persuasion.

¶20     The party aggrieved by the district court's decision bears the burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(8) (requiring appellants to provide reasoned legal argument, with "citations to legal authority and the record"). *See also 2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 32, 408 P.3d 313 (explaining that a party's contentions on appeal will not be addressed where the party fails to support them with "reasoned argument and legal authority") (citation and internal quotation marks omitted). And "[a]n appellate court is not a depository in which [a party] may dump the burden of argument and research." *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 (second alteration in original) (citation and internal quotation marks omitted). Accordingly, "where a party attempts to meet its burden of persuasion with general arguments rather than an analysis of the key contractual language," *Dos Lagos*, 2017 UT 29, ¶ 32, the burden will go unmet and affirmance ordinarily follows, *see id.* ¶ 33.

¶21     The Uzelacs maintain that the bridge loan expenses fall under the umbrella of their policy's "Additional Living Expense" (ALE) coverage. The relevant provision of the policy states that "[i]f a covered property loss makes the resident premises unfit to live in, we cover the necessary increase in living expense incurred by you so that your household can maintain its normal standard of living." Significantly, this language is nearly identical to the language of other ALE provisions that courts in this and several other states have had occasion to interpret. *See, e.g., Error v. Western Home Ins. Co.*, 762 P.2d 1077, 1082 (Utah 1988).

¶22     "Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685. "Courts interpret words in insurance policies according to their *usually accepted meanings*[.]" *Id.* (emphasis added). "[C]ourts must enforce an unambiguous

contract and may not rewrite an insurance contract . . . if the language is clear." *Id.* ¶ 6 (omission in original) (citation and internal quotation marks omitted).

¶23  In support of their claim that the bridge loan expenses are embraced by the "usually accepted meaning[]" of an ALE provision like the one in their policy, *Crook*, 1999 UT 47, ¶ 5, the Uzelacs offer only "general arguments rather than an analysis of the key contractual language," *Dos Lagos*, 2017 UT 29, ¶ 32. They maintain that the additional interest on the temporary loan should be considered a "necessary increase in living expense" because, "without the private money bridge loan, [they] would have potentially lost their mountain home to foreclosure." But the Uzelacs do not direct our attention to any language in the policy providing that the loss of their home in foreclosure proceedings would be a covered loss. Furthermore, while an abundance of case law construes the scope of ALE coverage, the Uzelacs do not point to a single decision from any jurisdiction holding or even suggesting that home-financing charges qualify as an additional living expense.

¶24  We recognize that the Uzelacs have dedicated several pages of their opening brief to arguing this issue. But as our Supreme Court has recently stated, when it comes to meeting the burden of persuasion on appeal, "it is not the size of an argument that matters." *Id.* ¶ 30. Here, while the Uzelacs have cited cases and offered arguments, their cases are inapposite, and their arguments are unfocused.

¶25  The Uzelacs' treatment of our Supreme Court's decision in *Error v. Western Home Insurance Co.*, 762 P.2d 1077 (Utah 1988), is illustrative in this regard. In that case, the Court held that an ALE award was proper to allow an insured to maintain her normal standard of living while her house was being rebuilt following a fire. *Id.* at 1082. The case did not involve any request to recover expenses related to the financing of the home. Nevertheless, the Uzelacs maintain that the case is relevant here because it stands for the proposition that "the primary objective

of property insurance" is "to put the insured back in the position he or she occupied prior to the loss." Therefore, their argument goes, FIE "owes the Uzelacs the duty of putting them back in the same place they were prior to" the vandalism, which included having access to a more favorable mortgage interest rate. But the principle they extract from *Error* is stated with such generality that it might well have been culled from *any* case involving the interpretation of an insurance policy. It sheds no light on the unique nature of ALE coverage.

¶26    For these reasons, we conclude that the Uzelacs have failed to carry their burden of persuasion on appeal. Accordingly, we hold that their bridge loan interest claim was properly dismissed on summary judgment.

## II. The Rental Value of a Comparable Vacation Home

¶27    The Uzelacs contend that the district court erred in dismissing their claim for the reasonable value of renting a comparable vacation home during the time theirs was being rebuilt. We conclude that the claim was properly dismissed on summary judgment because the Uzelacs did not produce evidence sufficient to raise a triable issue of fact.

¶28    In response to FIE's summary judgment motion, the Uzelacs maintained that a genuine factual dispute remained as to whether FIE breached the contract by affirmatively misrepresenting the scope of the policy's ALE coverage. They supported their argument by filing a declaration from Mr. Uzelac, in which he stated that an unidentified FIE representative orally informed him that the costs of renting substitute accommodations while the home was being rebuilt were not reimbursable under the policy. On appeal, FIE concedes that, in fact, such costs would have been covered under the policy's ALE provision. Nevertheless, the district court concluded that the claim should be dismissed, regardless of the truth of Mr. Uzelac's statement, as no expenses could be

reimbursed under the ALE provision unless they were actually incurred.[7]

¶29 By not addressing Mr. Uzelac's allegation of misrepresentation head on, the district court improperly discounted the possibility that such a misrepresentation could indeed have constituted breach of contract under these circumstances. Clearly, it would be unacceptable for insurers to avoid paying ALE claims simply by misrepresenting the scope of coverage in response to inquiries from their insureds. Nevertheless, we affirm the court's decision because the Uzelacs failed to support their argument with specific facts demonstrating the existence of a triable factual issue.[8]

¶30 "When a moving party makes and supports a motion for summary judgment, the non-moving party 'may not rest upon the mere allegations or denials of the pleadings, but the response . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Advanced Forming Techs., LLC v.*

---

7. In the alternative, the Uzelacs argue—in two short paragraphs—that the policy permits recovery of substitute-accommodation expenses irrespective of whether such expenses have been incurred because the policy defines "Property Damage," with our emphasis, as "physical injury to or destruction of tangible property . . . and *resulting loss of use*." The term "property damage," however, does not appear in the policy's ALE provision. We therefore fail to see how it is of any relevance here.

8. When reviewing a summary judgment decision, we are free to affirm on legal grounds other than those adopted by the district court. *See, e.g.*, *RJW Media, Inc. v. CIT Group/Consumer Fin., Inc.*, 2008 UT App 476, ¶ 36, 202 P.3d 291.

*Permacast, LLC*, 2015 UT App 7, ¶ 9, 342 P.3d 808 (omission in original) (quoting Utah R. Civ. P. 56(e) (2015)[9]). Indeed,

> [a] major purpose of summary judgment is to avoid unnecessary trial by allowing the parties to pierce the pleadings to determine whether there is a genuine issue to present to the fact finder. In accordance with this purpose, specific facts are required to show whether there is a genuine issue for trial. *The allegations of a pleading or factual conclusions on an affidavit are insufficient to raise a genuine issue of fact.*

*Stevens-Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 25, 248 P.3d 1025 (alteration and emphasis in original) (citation and internal quotation marks omitted).

¶31 We conclude that Mr. Uzelac's declaration did not state facts with the requisite specificity to preclude summary judgment against the Uzelacs. The relevant language from the declaration is as follows:

> The [FIE] adjuster told us that there was no coverage for a rental of a second home or any loss of use for a second home. Had I known that there was coverage, we would have found [a] comparable second home to rent somewhere else. I didn't do so because of what the adjuster told us.

---

9. Rule 56 of the Utah Rules of Civil Procedure was amended in 2015, after our decision in *Permacast* had already been issued. However, the advisory committee note makes clear that the amendment was intended to bring the rule in line with its federal counterpart, "without changing the substantive Utah law." Utah R. Civ. P. 56 advisory committee note.

The lack of specificity is conspicuous. There is no mention of the adjuster's name, when the conversation took place, whether it was over the phone or in person, and whether he or she referred to a specific policy provision. None of these basic details are provided, and without them, Mr. Uzelac's allegation was a "factual conclusion[,] . . . insufficient to raise a genuine issue of fact." *See id.* The declaration was therefore insufficient to defeat FIE's motion for summary judgment.

¶32    Accordingly, we conclude the Uzelacs have failed to set forth specific facts demonstrating the existence of a genuine factual dispute for trial relating to their claim for the fair rental value of alternate vacation accommodations. We therefore hold that the district court properly dismissed this claim on summary judgment.

### III. The Exhibit 1 Expenses

¶33    The Uzelacs maintain that the district court should not have dismissed their claims relating to the unreimbursed reconstruction expenses identified in Exhibit 1, including the snow-removal expense, as those expenses were never raised in FIE's motion for summary judgment. On this point, we agree.

¶34    FIE invites us to hold that the Uzelacs "waived" their claims relating to the Exhibit 1 expenses because the Uzelacs did not mention it in their opposition to the motion for summary judgment. Indeed, it does seem rather odd that the Uzelacs omitted this relatively straightforward issue from their opposition when they raised so many other, more complicated arguments. But regardless of the wisdom of these decisions on the Uzelacs' part, the fact remains that it is the moving party who determines the scope of summary judgment proceedings.[10]

---

10. FIE also complains that, "[b]ecause of the vague nature of the Uzelacs' pleadings and disclosures, [it] could not be certain what

(continued…)

¶35 The Utah Supreme Court articulated the dispositive rule in *Timm v. Dewsnup*, 851 P.2d 1178 (Utah 1993):

> The moving party determines the scope of a motion for summary judgment. That party decides what issues to present to the court for adjudication. He or she may move for summary judgment on all or less than all of the issues raised by the complaint . . . . When the moving party has decided what the scope of the motion for summary judgment shall be, rule 56 contemplates that a written motion shall be served on the opposite party setting forth with clarity the relief sought by the motion so that the opposite party may prepare to defend against it if he or she chooses to do so.
>
> Summary judgment procedure is generally considered a drastic remedy, requiring strict compliance with the rule authorizing it . . . . If the [requirements of the rules] are not fulfilled, both in

---

(…continued)

claims the Uzelacs were pursuing[.]" Yet it is clear from the record that FIE was made aware that the Uzelacs would seek to recover the expenses identified in Exhibit 1 as damages in their lawsuit. To begin with, the Uzelacs included the list of expenses among the documents they provided in their initial disclosures. And lest FIE complain that its failure to take notice of the list was attributable to the vague and conclusory nature of the Uzelacs' allegations and damages computation, we observe that, at least as of the date of Mr. Uzelac's deposition, these deficiencies were obviously not so severe as to prevent FIE from learning of the expenses. On the contrary, during Mr. Uzelac's deposition FIE specifically inquired about the expenses listed in Exhibit 1, and Mr. Uzelac gave no indication that he intended to abandon the claim.

> letter and spirit, the summary judgment procedure may become a vehicle of injustice rather than a salutary medium of reaching a swift but just result on a pure matter of law, as intended by the framers of the rules.

*Id.* at 1181 (alteration in original) (citations and internal quotation marks omitted). In *Timm*, our Supreme Court held that a party's counterclaim had survived summary judgment, despite the district court's subsequent ruling that the claim was implicitly dismissed by its summary judgment order. *Id.* at 1182. The Court reasoned that, because the party originally moving for summary judgment had "made no express reference to the counterclaim or the issues raised by it in [its] motion," the summary judgment order did not dispose of the counterclaim issues. *Id.* Thus, "in accordance with the policy that the procedure for summary judgment should be strictly observed," the Court concluded that the claim "remain[ed] unaffected in the trial court." *Id.*

¶36 Likewise, here, the scope of the summary judgment proceedings was determined by FIE's original motion.[11] By

---

11. FIE urges us to hold that its motion for summary judgment effectively placed the Exhibit 1 expenses within the scope of summary judgment proceedings because the motion itself—as opposed to the supporting memorandum—contained the general statement that "there is no dispute as to any material fact relating to the claims in Plaintiff's Complaint." But the generalized language in the single-paragraph motion cannot be read apart from the specific, detailed articulation of the motion's scope contained in the introductory section of the motion's supporting memorandum. There, FIE made clear that its motion was limited to addressing two issues, namely certain personal property losses and the additional bridge loan expenses. To conclude that the statement contained in the motion was

(continued…)

failing to expressly include the Uzelacs' claim to recover the Exhibit 1 expenses in its summary judgment motion, FIE effectively excluded the issue from the district court's consideration.[12] Furthermore, the express conclusions in the district court's summary judgment order are not inconsistent with the claim's survival. The court granted FIE's motion only as to the Uzelacs' claims for personal property losses, the additional bridge loan expenses, and the substitute accommodations expenses that they did not actually incur. The issue of whether FIE should be held liable for reimbursing the Uzelacs for the reconstruction services identified in Exhibit 1 is wholly independent of those claims.[13]

---

(…continued)

sufficient to place all the Uzelacs' claims in issue would be to thwart the Supreme Court's "strict compliance" instruction, thereby running the risk of transforming the summary judgment procedure into "a vehicle of injustice rather than a salutary medium of reaching a swift but just result." *Timm v. Dewsnup*, 851 P.2d 1178, 1181 (Utah 1993) (citation and internal quotation marks omitted).

12. We observe that in their opposition memorandum, the Uzelacs made a passing and rather cryptic reference to FIE's refusal to consider "other additional expenses, including extra utilities and snow-plowing." Arguably, the reference alluded to the list of expenses appearing in Exhibit 1. But even so, it did not suffice to bring the expenses within the scope of the summary judgment proceedings, because it appeared in the Uzelacs' *opposition* and it is the "moving party" that "decides what issues to present to the court for adjudication." *Id.*

13. Alternatively, FIE invites us to hold that, regardless of the substantive merits of the Uzelacs' objection to FIE's proposed order, the district court properly denied the objection because it

(continued…)

¶37   Finally, we turn to the snow-removal expense. We recognize that if one were to imagine all the different types of expenses that might arise in the ordinary course of repairing a vandalized home, snow-removal services would not readily come to mind. Still, it does not necessarily follow that the Uzelacs' claim for such expenses was illegitimate in this case. It is possible, for instance, that during the winter months the task of removing debris and beginning the extensive repairs could not be accomplished without first clearing a path to the home through the snow. We therefore leave it to the district court to determine the legitimacy of this expense, as a factual matter, on remand.

¶38   For the reasons stated above, we conclude that the issue of whether FIE is obligated to reimburse the Uzelacs for the expenses listed in Exhibit 1, including the expense of snow-removal, was not effectively placed before the court during summary judgment proceedings. It therefore "remains

---

(…continued)

was served ten days after the proposed order was served and was therefore untimely. *See* Utah R. Civ. P. 7(j)(4) ("A party may object to the form of the proposed order by filing an objection within 7 days after the order is served."). In a similar vein, FIE also asks us to hold that, because "the objection was related to the substance of the [o]rder" rather than its form, it was effectively a motion to reconsider, which is not recognized by the Utah Rules of Civil Procedure. *See Gillett v. Price*, 2006 UT 24, ¶ 7, 135 P.3d 861 ("[P]ostjudgment motions to reconsider and other similarly titled motions . . . are not recognized by our rules."). But these arguments miss the point. The issue of the Exhibit 1 expenses was never placed before the court on summary judgment and therefore "remain[s] unaffected in the trial court." *Timm*, 851 P.2d at 1182. Thus, the issue would remain pending before the district court even if the Uzelacs had not filed any objection at all to the proposed order.

unaffected in the trial court" and can be properly resolved on remand. *See Timm*, 851 P.2d at 1182.

IV. The Implied Covenant of Good Faith and Fair Dealing

¶39    The Uzelacs' final contention is that the district court erred in dismissing their claim that FIE breached the implied covenant of good faith and fair dealing. "As a general rule, every contract is subject to an implied covenant of good faith and fair dealing, under which both parties to a contract promise not to intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract." *Malibu Inv. Co. v. Sparks*, 2000 UT 30, ¶ 19, 996 P.2d 1043 (citation and internal quotation marks omitted). However, "we will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves. Nor will we construe the covenant to establish new, independent rights or duties not agreed upon by the parties." *Id.* (citation and internal quotation marks omitted).

¶40    The Uzelacs maintain that there remained triable issues of fact as to whether FIE breached the covenant by rejecting their claims for the additional bridge loan expenses, the rental value of substitute accommodations, and the expenses associated with ServiceMaster's negligent handling and storage of their personal property. As to the first claim, we have already concluded that the Uzelacs failed to show that the bridge loan expenses were recoverable under the policy's ALE provision. Thus, FIE's decision to reject this claim has been fully vindicated. As to the second claim, we concluded above that the Uzelacs failed to properly establish any disputes of material fact bearing on their claimed entitlement to recover substitute accommodation expenses without having actually incurred them. Accordingly, because it is undisputed that the Uzelacs never incurred any expense for FIE to reimburse, the plain terms of the policy permitted it to deny this claim as well. Finally, as to the third claim, the Uzelacs have not argued that FIE had a duty *under the policy* to compensate them for ServiceMaster's misfeasance.

Because we will not "construe the covenant to establish new, independent rights or duties not agreed upon by the parties," *id.* (citation and internal quotation marks omitted), we conclude that the district court properly dismissed this claim on summary judgment, too.[14]

CONCLUSION

¶41 For the reasons stated above, we affirm the district court's decision in part, and we reverse it in part. We remand for the limited purpose of addressing the Exhibit 1 expenses, including the snow-removal expense, which we have concluded were not effectively placed before the court during the summary judgment proceedings.

─────────

14. The Uzelacs attached an expert report to their opposition to FIE's summary judgment motion in support of their claims for breach of the implied covenant of good faith and fair dealing. We have not considered it in our analysis here because the district court excluded it as untimely. *See Sunridge Dev. Corp. v. RB&G Eng'g, Inc.*, 2013 UT App 146, ¶ 17, 305 P.3d 171 ("Inadmissible evidence cannot be considered in ruling on a motion for summary judgment.") (brackets, citation, and internal quotation marks omitted).